# United States District Court
### for the
### District of Guam

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Information Associated with (671) 727-8558 Stored at PTI Pacifica, Inc., dba IT&E, 122 West Harmon Industrial Park Road, Suite 103, Tamuning, Guam (See Attach A)

)
)
)
)
)
)

Case No.

FILED
DISTRICT COURT OF GUAM

AUG 06 2018

JEANNE G. QUINATA
CLERK OF COURT

MJ-18-00100



## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
Information Associated with (671) 727-8558 Stored at PTI Pacifica, Inc., dba IT&E, 122 West Harmon Industrial Park Road, Suite 103, Tamuning, Guam. Property further described in Attachment A.

located in the _____ District of _____ Guam _____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B which is incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. Sections 841(a)(1) and 846 | Distribution of Methamphetamine |

The application is based on these facts:

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

PATRICK ERNST, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _August 6, 2018_

_____
*Judge's signature*

City and state: Hagatna, Guam

JOAQUIN V.E. MANIBUSAN, JR., U.S. Magistrate Judge
*Printed name and title*

rsn

ORIGINAL

# A F F I D A V I T

I, Patrick Ernst, Special Agent of the Federal Bureau of Investigation (FBI), being duly sworn, hereby declare as follows:

## I. INTRODUCTION

### A. Professional Background

1. I am a special agent of the FBI and have been so employed since August 15, 2010. I am currently assigned to the white collar and public corruption criminal squad in the Guam Resident Agency in the Honolulu Field Office. As a federal agent, I am authorized to investigate violations of the laws of the United States and I am a law enforcement officer with authority to execute warrants issued under the authority of the United States. My FBI special agent training consisted of a twenty-one week new agent training class during which I received instruction on various aspects of federal crime. During the training, I learned about a variety of investigations including health care fraud, internet fraud, investment fraud and other federal crimes. Prior to becoming an FBI special agent, I was a special agent for Internal Revenue Service - Criminal Investigation (IRS-CI) for approximately five years. As a special agent for IRS-CI, I trained at the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia for twenty-four weeks. Training at FLETC consisted of instruction on legal principles and a variety of federal criminal violations, including money laundering, tax evasion and other tax-related crimes. I have conducted criminal investigations involving gangs, drug trafficking, violent fugitives as well as white-collar crimes involving investment fraud, tax evasion and public corruption, and violations of the Bank Secrecy Act. I have also participated in the planning and execution of numerous federal search, seizure and arrest warrants involving the above violations.

1

## B. Professional Background of Special Agent Aaron R. Joseph

2. During the course of this investigation, I consulted with Special Agent Aaron R. Joseph with the Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF). Special Agent Joseph has been employed with ATF since August, 2003. He is currently assigned to the Guam Field Office and he is charged with the investigation and enforcement of violations of federal firearms laws and associated violations. Prior to this employment, Special Agent Joseph was a police officer for the city of Charleston, South Carolina, and he was so employed from 2001-2003. Special Agent Joseph is a graduate of the South Carolina State Criminal Justice Academy, the Federal Law Enforcement Training Center's Criminal Investigation Training Program, and the ATF Special Agent Basic Training Program. Special Agent Joseph has attended numerous classes, seminars and training lectures in the investigation of criminal violations of federal and state laws. He has conducted multiple drug and firearms related investigations, and he has obtained and executed both federal and state search and arrest warrants.

3. As a special agent with the ATF, Special Agent Joseph participated in drug investigations of criminal violations of the Controlled Substances Act. He has also participated in undercover investigations involving the purchase of controlled substances, assisted in the execution of both state and federal search warrants relating to controlled substances, and he has conducted numerous surveillances and controlled deliveries in connection with drug investigations.

4. Special Agent Joseph is familiar with the operations of illegal drug trafficking organizations (DTO) in the United States, and DTO with a foreign nexus. Additionally, Special Agent Joseph received training on the methods of unlawful drug trafficking, the identification of controlled substances, the means by which drug traffickers derive, launder

2

and conceal their profits from drug trafficking, the use of assets to facilitate unlawful drug trafficking activities, and the law permitting the forfeiture to the United States of assets purchased with drug proceeds, or assets, intended to be used to facilitate the drug violations.

5. During his employment as a special agent, Special Agent Joseph participated in investigations, regarding violations of the Hobbs Act; specifically, violations concerning color of official right. Special Agent Joseph has relayed to me that, in certain instances, public officials are sometimes paid with cash by third party individuals and/or directly by drug dealers in exchange for performance or non-performance of their official duties.

6. Through my discussions with Special Agent Joseph, I know that an ounce of methamphetamine on Guam typically costs approximately $6,500.00 to $12,000.00 per ounce, that a gram of methamphetamine costs from $150-$700 per gram, and that smaller quantities, referred to in street terms as "plates", and "quads" (a quad may be described as two and a half plates), are smaller, user-quantity amounts; and I also know that plates cost from $50.00 to $100.00 per unit, and that quads cost from $150.00 to $250.00 per unit. I know that all of these prices will vary and fluctuate depending on the availability of the drug in the region or the consumer demand for the drug at any given time; and also, with the consumer/dealer relationship.

7. I know from my own experience and my discussions with Special Agent Joseph that drug traffickers often use cellular telephones to communicate instructions, either by audio or by text, their plans and intentions to their criminal associates and to report on the progress of their criminal activities. I am aware that evidence of these instructions, plans, reports and general discussions of criminal activities are sent or received in the form of text messages, incoming and outgoing call histories, or voice messages left in personal voice mail systems. I am familiar in

3

the methods in which text messages are sent and received via third party phone applications (most commonly referred to as "Apps") and that they are widely used.

8. The ATF and FBI are working a joint investigation into the financial and drug trafficking activities of Audrey WOLFORD (WOLFORD), John T. MANTANONA (MANTANONA), Kenneth D. MANTANONA (Captain KD) and others. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided directly to me, or was provided by another law enforcement officer (who may have had either direct or hearsay knowledge of the statement) to whom I have spoken or whose report I have read and reviewed. Such statements are stated in substance, unless otherwise indicated. I have not included every fact known to me about this investigation.

9. This affidavit is being submitted for the limited purpose of securing a search warrant. Therefore, I have not included each and every fact known to me concerning this investigation. I have only set forth facts that I believe are necessary to establish probable cause to believe that the information requested below potentially contains evidence of violations of Title 21, United States Code, Sections 841, 843 and 846, and other criminal activities. The specific items to be searched are described as follows:

The text messages and all peripheral data, content, including subscriber information, call logs, method of payment, voice messages, photographs, videos, emails, International Mobile Equipment Identity (IMEI) number or Electronic Serial Number (ESM) for the cellular telephone, and electronic telephone book assigned to the account database of cellular telephone number identified as a (671) 727-8558 (TARGET PHONE), which is a phone number belonging to PTI Pacifica, Inc., dba IT&E and utilized by MANTANONA.

4

## II. STATEMENT OF PROBABLE CAUSE

### A. Investigation Background

10.  During the course of the investigation, I learned Eric APONIK (APONIK) was the leader of an organization responsible for the distribution of methamphetamine on the island of Guam, and APONIK had multiple associates responsible for the distribution of methamphetamine, to include Vincent RIOS (RIOS) A/K/A "Ben" and WOLFORD. RIOS was arrested in November of 2016, after attempting to pick up a package containing approximately 18 pounds of methamphetamine from the U.S. Post Office. In March of 2018, RIOS pleaded guilty to drug and money laundering charges and is currently awaiting sentencing.

11.  I reviewed a Drug Enforcement Administration (DEA) report dated April 19, 2017, regarding a debriefing of RIOS. According to the report, RIOS told investigators he provided MANTANONA with $30,000 for information as to whether RIOS was going to be investigated by law enforcement. RIOS further stated he was once pulled over by Guam Police Department (GPD) and he called MANTANONA to speak to the officer. After the call, the officer allowed RIOS to leave. RIOS said he had $250,000 and about 600 grams of meth in the car when he was pulled over by GPD. RIOS stated he paid MANTANONA $5,000 for helping him with the GPD traffic stop. RIOS said he also paid MANTANONA $5,000 for helping him with an issue with his driver's license and another $5,000 for other information at a later time. RIOS said that MANTANONA asked him for $25,000 to help a sick relative. RIOS said he also gave MANTANONA $30,000 to pay off MANTANONA's Lexus. I know that MANTANONA has a 2015 Lexus ES 350, bearing Guam license plate number SJ 2912 and vehicle identification number (VIN) JTHBK1GG5F2164609, registered to him and that this vehicle has been registered to MANTANONA since November 25, 2014.

5

12. Based on my training, experience and knowledge of this case, I believe RIOS paid MANTANONA $5,000 as protection from GPD interference with RIOS' drug distribution activities. I further believe RIOS paid $30,000 to MANTANONA for information pertaining to whether RIOS was going to be investigated by law enforcement. I believe RIOS paid MANTANONA this money for information because of MANTANONA's access to law enforcement sensitive information as set forth below.

13. Search warrants for WOLFORD'S phone accounts further revealed WOLFORD was communicating with MANTANONA, who WOLFORD referred to as "Uncle". The communications between MANTANONA and WOLFORD primarily consisted of MANTANONA requesting payment and WOLFORD arranging to pay MANTANONA or explaining why she did not have money to pay MANTANONA.

14. In September of 2017, ATF agents executed a search warrant for historical text communications for TARGET PHONE, MANTANONA's phone account. MANTANONA's phone records revealed his frequent calls to GPD and to Captain KD.

15. In October of 2017, FBI joined the investigation of WOLFORD and MANTANONA due to MANTANONA's connections with GPD and concerns of public corruption within the department. Since that time, ATF, FBI, United States Postal Inspection Service (USPIS) and Homeland Security Investigations (HSI) have been jointly working the investigation.

## B. WOLFORD Communication Accounts

16. ATF agents executed search warrants for call detail records and text messages on WOLFORD's phone number (671) 788-1903 (MJ-17-00067, MJ-17-00086 and MJ-17-00109). After reviewing the text messages, which comprise texts between February 2, 2017 and August 4, 2017, I believe the text messages are indicative of ongoing drug trafficking and other illegal

6

activities. The following text message conversations are examples of WOLFORD's text

conversations:

| DATE & | FROM | TO | TEXT CONTENT |
|---|---|---|---|
| 5/4/2017 22:25 | 16717871400 | 16717881903 | How much you got left can buy some.if you still have. |
| 5/4/2017 22:26 | 16717881903 | 16717871400 | Why what happen to Juan |
| 5/4/2017 22:26 | 16717871400 | 16717881903 | Busy or later on |
| 5/4/2017 22:27 | 16717881903 | 16717871400 | K |
| 5/4/2017 22:27 | 16717871400 | 16717881903 | I think going to come down not to sure didnt really understand.@ |
| 5/4/2017 22:29 | 16717871400 | 16717881903 | You have any left. |
| 5/4/2017 22:37 | 16717881903 | 16717871400 | Nope goimg to re up |
| 5/4/2017 22:38 | 16717871400 | 16717881903 | Okay |
| 5/5/2017 8:14 | 16719873418 | 16717881903 | Morning could you hook up a 50? |
| 5/5/2017 8:21 | 16717881903 | 16719873418 | Noithing til lunch time@ |
| 5/5/2017 8:55 | 16719873418 | 16717881903 | Ok thanks |
| 5/5/2017 21 :52 | 16719674176 | 16717881903 | Got 40 here can I get |
| 5/5/2017 21:52 | 16717881903 | 16719674176 | Ya |
| 5/5/2017 21:52 | 16719674176 | 16717881903 | K. I.B up |
| 5/5/2017 21:52 | 16717881903 | 16719674176 | K |
| 5/10/2017 2:02 | 16717881903 | 16719674176 | Call me if you want a plate |
| 5/12/2017 12:25 | 16717874066 | 16717881903 | GOOD AFTERNOON NEIGHBOR. SUMI NEEDS SUMTHING.DO YOU HAVE ANYTHING? |
| 5/12/2017 12:25 | 16717874066 | 16717881903 | JUST A SMALL 1 |
| 5/12/2017 20:19 | 16717881903 | 16718588311 | If you want i have enough in the pipe for u too smoke but only u .. |
| 5/12/2017 20:20 | 16717881903 | 16718588311 | Until later she'll give me some more. |
| 5/22/2017 17:07 | 16719873418 | 16717881903 | OK I'd get at least 40 could you help me out |
| 5/22/2017 17:07 | 16717881903 | 16719873418 | Ya |
| 5/22/2017 17:07 | 16719873418 | 16717881903 | OK thanks prima |
| 5/22/2017 17:08 | 16717881903 | 16719873418 | Yw |
| 5/22/2017 17:37 | 16717881903 | 16719873418 | Are u still coming |

Case 1:18-mj-00100   Document 1   Filed 08/06/18   Page 8 of 52

| | | | |
|---|---|---|---|
| 5/22/2017 17:46 | 16719873418 | 16717881903 | I don't have the money till later around 8 |
| 5/22/2017 17:47 | 16717881903 | 16719873418 | K |
| 5/22/2017 17:48 | 1671 9873418 | 16717881903 | But if you could front it till then that would be great |
| 5/22/2017 17:51 | 16717881903 | 16719873418 | Man i really need the crash |
| 5/22/2017 17:52 | 16719873418 | 16717881903 | Yes I'll give vou the money at 8 |
| 5/31/2017 13:33 | 16717881903 | 16718588311 | Yup he got court at 2om@ |
| 5/31/2017 13:34 | 16717881903 | 16718588311 | Todav |
| 5/31/2017 13:34 | 16717881903 | 16718588311 | No release |
| 5/31/2017 13:34 | I 6718588311 | 16717881903 | Dam that boy. Now he has to check in |
| 5/31/2017 13:34 | 16717881903 | 16718588311 | LMAO |
| 5/31/2017 13:35 | 16717881903 | 16718588311 | No drugs for him |
| 5/31/2017 13:35 | 16717881903 | 16718588311 | Decrease the dosage |

17.    Based on my training, experience, and discussions with Special Agent Joseph these text message conversations are indicative of drug trafficking. I am aware that drug traffickers on Guam use slang terms such as "dope", "ice", "plate", or "smoke" to refer to methamphetamine. I am aware that the phrase, "re up", is used by drug traffickers to indicate they are replenishing their drug supply.  I am also aware that the term, "front", is used by drug traffickers and drug users to indicate an advance of drugs.  The numerical denominations in the above text messages continue to be consistent with the prices of methamphetamine on Guam.

**C. Search Warrants Executed at WOLFORD's Residence**

18.    On December 6, 2016, a multi-agency task force executed a search warrant (MJ-16-00137) at the residence of WOLFORD located at 223 Bejong Street, Barrigada, Guam (WOLFORD's residence).  Investigators seized items of evidence that included a ledger sheet and drug paraphernalia.

8

19. On November 20, 2017, investigators learned that a package was mailed to 106 Mansana Lane in Dededo, Guam. A search warrant (MJ-17-00160) revealed that the contents of the package contained approximately 18 grams of methamphetamine. The methamphetamine was removed, and a breaching and tracking device, along with an ultraviolet dye ("clue spray"), was placed inside of the package.

20. On November 30, 2017, a multi-agency task force executed a search warrant at WOLFORD's residence (MJ-17-00168) after WOLFORD picked up the package referenced above from the U.S. Post Office in Barrigada, transported it to her home, and subsequently breached it. The search recovered a digital scale, baggies, and other paraphernalia. Also, among the items seized at WOLFORD's residence was a hand-written document referencing names of individuals "being watched", "arrested", "taken down", and/or "under surveillance." After one individual (last name Mendoza), there is a notation "Do not go near her." The document also references individuals who have a "supplier" and who owe money or a "protection fee". Based on my training, experience and knowledge of this case, I believe this document is indicia of WOLFORD's attempts to record which individuals owe her money and which individuals may be under the suspicion of law enforcement or cooperating with law enforcement in drug investigations.

**D. Controlled Purchases of Methamphetamine Hydrochloride from WOLFORD**

21. On February 12, 2018, a confidential source (CS) CS #2 purchased jewelry from WOLFORD at ATF's direction. This jewelry is known to ATF to be derivative of drug trafficking. On February 26, 2018, CS #2 purchased 5 grams of methamphetamine for $1,250 and paid WOLFORD the remaining balance for the previous jewelry purchase ($300). This controlled purchase took place in the parking lot of the IGA Island Fresh grocery store.

9

22. On May 3, 2018, CS #2 purchased another 5 grams of methamphetamine from WOLFORD for $1,000. WOLFORD met CS #2 in the parking lot of the Dededo Payless grocery store.

**E. Communication between MANTANONA and WOLFORD**

23. MANTANONA is a retired Guam Police Department (GPD) officer and former task force officer (TFO) for the FBI and DEA. He is currently a private investigator for well-known Guam defense attorney David Lujan.

24. Search warrants on WOLFORD's phone accounts revealed frequent text and phone calls to (671) 727-8558 (TARGET PHONE). Phone records obtained from IT&E through a grand jury subpoena for records associated with phone number (671) 727-8558 (TARGET PHONE) reveal the subscriber to be "Evelyn and John T. Mantanona" residing in Inarajan, Guam.

25. Agents executed a search warrant for call records and text communications associated with TARGET PHONE and known phone numbers attributed to WOLFORD, to include (671) 685-3978, (671) 685-0446, and (671) 788-1903. Based upon my review, the vast majority of the text conversations pertain to MANTANONA, using TARGET PHONE, requesting money from WOLFORD on the phone numbers attributed to WOLFORD. WOLFORD typically responds that she cannot pay MANTANONA because she has not been paid yet. The following text messages conversations are examples of communications between MANTANONA and WOLFORD in 2016 and 2017:

| DATE & TIME | FROM | TO | TEXT CONTENT |
|---|---|---|---|
| 9/7/2016 22:28 | 16717278558 | 16716853978 | audrea can I pick up something tomr in the afternoon the want u ask me to check no names mention thks |

10

| | | | |
|---|---|---|---|
| 9/18/2016 8:15 | 16717278558 | 16716853978 | DO U HAVE FOR ME SOMETHING TO MEET AND PICK THKS |
| 9/18/2016 8:16 | 16716853978 | 16717278558 | Nope tomorrow |
| 9/18/2016 8:16 | 16716853978 | 16717278558 | Chris didnt drop the 1000 |
| 9/18/2016 8:16 | 16716853978 | 16717278558 | So tomorrow |
| 9/18/2016 8:48 | 16717278558 | 16716853978 | OK IN THE AFTERNOON THKS |
| 9/19/2016 19:39 | 16717278558 | 16716853978 | DID U PICK UP THE BOX OF PAPERS HOW MUCH AND CAN I PICK TONITE |
| 9/22/2016 23:35 | 16717278558 | 16716850446 | DONT FORGET I PICK UP AT TEN AM THKS |
| 9/24/2016 15:29 | 16717278558 | 16716850446 | CAN I PICK UP AT 530PM |
| 9/24/2016 15:30 | 16716850446 | 16717278558 | Noithing i just woke up@ |
| 9/26/2016 2:08 | 16717278558 | 16716850446 | DONT FORGET BEFORE LUNCH I PICK UP THE DOCUMENTS |
| 9/26/2016 2:08 | 16716850446 | 16717278558 | I am trying |
| 9/26/2016 15:11 | 16717278558 | 16716850446 | READY TO PICK UP |
| 9/26/2016 15:11 | 16716850446 | 16717278558 | Nope not yet |
| 9/26/2016 15:11 | 16716850446 | 16717278558 | I call u |
| 9/26/2016 15:12 | 16717278558 | 16716850446 | CAN IT BE BEFORE 530 |
| 9/26/2016 15:13 | 16716850446 | 16717278558 | I just waitung@ |
| 9/26/2016 15:14 | 16716850446 | 16717278558 | For customer |
| 9/26/2016 15:14 | 16716850446 | 16717278558 | I call u |
| 10/4/2016 10:55 | 16717278558 | 16716850446 | CAN I PICK UP TODAY SOMETHING TODAY AM AT AK PAY ADDITIONAL CAR PROBLEM INSTEAD THIS FRIDAY THKS |
| 10/4/2016 10:57 | 16716850446 | 16717278558 | I try cause i had to return the stuff to ben becsuse it was bunk |
| 10/5/2016 2:53 | 16717278558 | 16716850446 | CALLME U WOKE ME UP WHATS UP I PICK UP THIS AFTERNOON |
| 10/5/2016 2:55 | 16716850446 | 16717278558 | Dont have anything yet still waiting on benn to replace@ |

11

| | | | |
|---|---|---|---|
| 10/5/2016 22:38 | 16717278558 | 16716850446 | I NEED UR SUPPORT I NEED ONE K TO BUY COMPUTER FOR THE BMW THE TOTAL IS 4K I WILL TRY TO BORROW SOMEBODY THEY NEED TO ORDER THAT PARTS THKS |
| 10/5/2016 23:17 | 16716850446 | 16717278558 | Uncle what happen to all the money me and ben gave u for that car |
| 10/5/2016 23:17 | 16716850446 | 16717278558 | Anyways i wont have until i get back |
| 10/5/2016 23:19 | 16716850446 | 16717278558 | But if this person comes through by helping |
| 10/5/2016 23:19 | 16716850446 | 16717278558 | Me til i leave i will give u.. |
| 10/5/2016 23:23 | 16717278558 | 16716850446 | K THKS BUT I NEED AS SOON AS POSSIBLE SO BMW CAN ORDER RIGHT AWAY MY BM STILL IN DEDEDO GOING ON 2 WEEKS |
| 10/5/2016 23:24 | 16716850446 | 16717278558 | I thought thats done already since i gave u money for it.. but ya I will let u know because even me too I am struggling just to make ends meet.. |
| 10/5/2016 23:25 | 16716850446 | 16717278558 | But i will try... i know i have to pay.. |
| 10/5/2016 23:30 | 16717278558 | 16716850446 | THIS IS DIFFERENT THEY JUST FOUND OUT THIS SATURDAY ALL LIGHTS ARE ON CAUSING BY THE COMPUTER |
| 10/5/2016 23:31 | 16716850446 | 16717278558 | Okay i will try. |
| 10/5/2016 23:31 | 16717278558 | 16716850446 | THKS |
| 6/1/2017 19:22 | 16717278558 | 16717881903 | Did they call u they promise i can protect them no more if i didnt get anything u know what is going to happen thanks |
| 6/1/2017 20:22 | 16717881903 | 16717278558 | Uncle give me til Saturday because thev are on lockdown right now s |
| 6/1/2017 20:22 | 16717881903 | 16717278558 | ince this morning.. |
| 6/1/2017 20:25 | 16717278558 | 16717881903 | Ok but have him no mention on the phone be careful cus they are watching them |
| 6/1/2017 20:26 | 16717881903 | 16717278558 | K |

12

| 6/1/2017 20:28 | 16717278558 | 16717881903 | Am with the team talking to them |
|---|---|---|---|
| 6/1/2017 20:29 | 16717881903 | 16717278558 | Oh shit@ |
| 7/21/2017 21 :08 | 16717881903 | 16717278558 | Just wondering why baubata patrolling my area |
| 7/21/2017 21:08 | 16717881903 | 16717278558 | Baubata@ |
| 7/21/2017 21:10 | 16717278558 | 16717881903 | Dont worry u r smarter |
| 7/21/2017 21:10 | 16717881903 | 16717278558 | K |
| 8/19/2017 17:55 | 16717278558 | 16717881903 | AM ARRIVING AT 530 TODAY ANY GOOD NEWS |
| 8/19/2017 18:05 | 16717881903 | 16717278558 | Just waiting on supply hopefully monday@ |
| 8/19/2017 18:05 | 16717881903 | 16717278558 | Make money again |

26. Based upon my review of the text conversations between MANTANONA and WOLFORD, I observe that a vast majority of the text conversations are in regards to MANTANONA, using TARGET PHONE, requesting money from WOLFORD on the phone numbers attributed to WOLFORD. On September 7, 2016, MANTANONA using TARGET PHONE texts to (671) 685-3978, "audrea can I pick up something tomr in the afternoon the want u ask me to check no names mention thks". Based upon the previous requests for money, it is my belief that this particular text conversation is another request by MANTANONA on TARGET PHONE to pick up money from WOLFORD. Based on my training and experience, I further believe that MANTANONA, using TARGET PHONE, is conveying to WOLFORD that a check for names was conducted and the check came back with a no results.

27. Beginning September 18, 2016 through September 26, 2016, I believe MANTANONA, using TARGET PHONE, sends multiple text messages to WOLFORD at (671) 685-0446 requesting to pick up money. On September 18, MANTANONA requested to meet and pick up. WOLFORD tells MANTANONA "Nope tomorrow" and "Chris didnt drop the 1000". Based upon my training and experience, I believe WOLFORD is waiting for drug

13

proceeds to be delivered so MANTANONA can be provided with payment. On September 26, 2016, MANTANONA, using TARGET PHONE, requested to pick up "the documents". WOLFORD, utilizing the phone number (671) 685-0446, responds that she is waiting for a customer and that a call to MANTANONA is forthcoming.

28. On October 4, 2016, MANTANONA, using TARGET PHONE, text messages WOLFORD at (671) 685-0446, "CAN I PICK UP TODAY SOMETHING TODAY AM AT AK PAY ADDITIONAL CAR PROBLEM INSTEAD THIS FRIDAY THKS". WOLFORD responds, "...i had to return the stuff to ben becsuse it was bunk". Based upon my training and experience and discussions with Special Agent Joseph, I believe that MANTANONA was requesting to pick up money from WOLFORD, and that WOLFORD could not provide the money because of her receipt of low quality or counterfeit drugs from RIOS.

29. On October 5, 2016, MANTANONA, using TARGET PHONE, texts to WOLFORD at (671) 685-0446, "CALLME U WOKE ME UP WHATS UP I PICK UP THIS AFTERNOON." WOLFORD responds, "Dont have anything yet still waiting on benn to replace@". I know, based upon my training and experience, that the reference "to replace" is a follow up to the previous conversation where WOLFORD provides that she received "bunk". Later on the same date, WOLFORD asks MANTANONA, "Uncle what happen to all the money me and ben gave u for that car" and later, "But i will try ... i know i have to pay..". I know that "ben" is an alias for RIOS. Based on the DEA report dated April 19, 2017, regarding a debrief of RIOS, I know that RIOS paid money to MANTANONA in the past for information on whether RIOS was being investigated by law enforcement. Based on the DEA debrief of RIOS, RIOS gave $30,000 to MANTANONA to pay off MANTANONA's Lexus.

30. On June 1, 2017, MANTANONA, using TARGET PHONE, texts WOLFORD at

14

(671) 788-1903, "Did they promise i can protect them no more if i didnt get anything u know what is going to happen thanks". WOLFORD responds, "Uncle give me til Saturday because they are on lockdown right now since this morning ..". MANTANONA responds "Ok but have him no mention on the phone be careful cus they are watching them" and later "Am with the team talking to them". WOLFORD responds, "Oh shit@". Based upon my training and experience, and my discussions with Special Agent Joseph, I believe that MANTANONA is referring to providing information, or protection to inmates at the Guam Department of Corrections (DOC), and that MANTANONA is in the position to receive information from law enforcement, and is in the presence of law enforcement. Specifically, I believe that when MANTANONA texts "...i can protect them no more if i didn't get anything ..." is a direct reference to providing information or protection in exchange for payment. I also believe that when WOLFORD texts" ...they are on lockdown right now", she is referencing inmates in the Guam DOC. I further believe when MANTANONA texts, "Ok but have him no mention on the phone be careful cus they are watching them," that MANTANONA is referring to inmates at the Guam DOC. Inmates at the DOC frequently use the phone system at the DOC and the phone system advises that calls from the phone system are recorded. Based on my training and experience, I believe MANTANONA was warning WOLFORD to have the DOC inmates be cautious in their telephone discussions because law enforcement could review the recordings of the calls. I also know that in the law enforcement community, groups of law enforcement assembled for tactical operations, or other law enforcement matters are routinely referred to as "teams."

31. On July 21, 2017, WOLFORD, using (671) 788-1903, text messages MANTANONA at TARGET PHONE, "Just wondering why baubata patrolling my area", "Baubata@" to which

15

MANTANONA responds, "Dont worry u r smarter". I know from this case and my discussions with Special Agent Joseph that GPD Officer Benny Babauta routinely arrests drug traffickers. When MANTANONA responds, "Dont worry u r smarter," I believe this to be an indication of MANTANONA's knowledge of WOLFORD's drug trafficking activities, and that WOLFORD is smarter than law enforcement.

32. On August 19, 2017, MANTANONA, using TARGET PHONE, text messages WOLFORD at (671) 788-1903, "AM ARRIVING AT 530 TODAY ANY GOOD NEWS." WOLFORD responds, "Just waiting on supply hopefully monday@", "Make money again." Based upon my knowledge of WOLFORD'S text messages, and my training and experience, I believe that when WOLFORD texts, "Just waiting on supply...." and "Make money again" that WOLFORD is referring to receiving a supply of drugs, so that they can sell the drugs and make money.

**F. Communications Between MANTANONA and Captain KD**

33. Kenneth D. MANTANONA (Captain KD) is the division chief for the Criminal Investigations Division (CID) of GPD. This position also includes the oversight of the GPD Mandana Drug Task Force (GPD Mandana). GPD CID is responsible for the majority of the criminal investigations for the department. As set forth in more detail below, Captain KD is providing MANTANONA with sensitive law enforcement information and authorizing MANTANONA to participate on GPD official actions, surveillances and enforcement operations.

34. Agents obtained call records and text communications for TARGET PHONE pursuant to search warrants (MJ-17-00143 and MJ-18-00001). The call records show TARGET PHONE having regular calls and text messages with phone number (671) 482-3274. Based on

16

my discussions with Special Agent Joseph, I know that the phone number (671) 482-3274 is a cellular phone number belonging to IT&E and is utilized by GPD Captain KD. I believe MANTANONA and Captain KD are related.

35. During the investigation, I consulted with Homeland Security Investigations (HSI) Special Agent Erwin Fejeran, who separately advised me that phone number (671) 482-3274 is used by Captain KD. Special Agent Fejeran was provided Captain KD's cellular phone number of (671) 482-3274 during a law enforcement briefing he attended on May 30, 2018. The briefing concerned a GPD Mandana operation conducted jointly with HSI for a controlled delivery of methamphetamine. Captain KD participated in the operation and, consequently, Captain KD's phone number was disseminated to team members involved with the operation.

36. The following are examples of pertinent text exchanges between MANTANONA, using TARGET PHONE, and Captain KD, using (671) 482-3274, from September 12, 2016 to December 28, 2018:

| DATE & TIME | FROM | TO | TEXT CONTENT |
|---|---|---|---|
| 9/12/2016 15:38 | 16714823274 | 16717278558 | Is it a gray Nissan sentra |
| 9/12/2016 15:39 | 16717278558 | 16714823274 | who is the register owner |
| 9/12/2016 15:40 | 16714823274 | 16717278558 | John Sarmiento |
| 9/12/2016 15:41 | 16714823274 | 16717278558 | Is it a gray sedan |
| 9/12/2016 15:42 | 16714823274 | 16717278558 | I think this is wrong |
| 9/12/2016 15:46 | 16714823274 | 16717278558 | That is wrong info! |
| 9/19/2016 9:26 | 16714823274 | 16717278558 | 483-0840 |
| 10/11/2016 9:02 | 16717278558 | 16714823274 | PRIM CHECK ON THAT I ASK U ABOUT THE CASE |
| 10/11/2016 9:03 | 16714823274 | 16717278558 | Yes |
| 10/11/2016 9:07 | 16717278558 | 16714823274 | OK I WILL GUIDE HIM HOW TO DO IT AND SHOW THE LOCATION AND WHERE THE WITNESSES STAY AND WHEN THEY RECOVER THE BACKHOE |
| 10/13/2016 5:30 | 16714823274 | 16717278558 | I ll have Reyes call you after the |

17

| | | | execution of the warrant this morning |
|---|---|---|---|
| 10/13/2016 10:38 | 16717278558 | 16714823274 | CALL ME CUS ONE OF OUR FAMILY PASSED AWAY ASAP |
| 12/12/2016 15:34 | 16714823274 | 16717278558 | He was arrested and confined.  He is still on probation? |
| 12/25/2016 6:41 | 16714823274 | 16717278558 | prim merry christmas to u and ur family prim am inspecting gift from u and what u owed me pay off coming prim I promised u I would not bother u |
| 12/25/2016 9:21 | 16717278558 | 16714823274 | prim I woke up I went outside to whether u drop it off but instead of my gift dog trash all over the house |
| 12/31/2016 21:09 | 16714823274 | 16717278558 | prim u have 3 an a half hours to pay up please prim and jan 2 2ol7 u can open new account happy new year to u and ur family |
| 12/31/2016 21:35 | 16714823274 | 16717278558 | Biba Anu Nuebu! |
| 12/31/2016 21:37 | 16717278558 | 16714823274 | can I come and pick up the pay I met with gdoe alexis ada |
| 12/31/2016 22:03 | 16714823274 | 16717278558 | What did he say? |
| 12/31/2016 22:04 | 16717278558 | 16714823274 | call me |
| 1/16/2017 8:05 | 16714823274 | 16717278558 | You still owe me...hahaha |
| 1/26/2017 14:16 | 16714823274 | 16717278558 | I ll call you later.  Did you email the document? |
| 1/26/2017 14:17 | 16717278558 | 16714823274 | No but i need to talk to u urgent now |
| 1/26/2017 19:01 | 16714823274 | 16717278558 | K |
| 1/30/2017 16:21 | 16714823274 | 16717278558 | I m in a meeting. |
| 1/30/2017 16:21 | 16714823274 | 16717278558 | Got it |
| 2/3/2017 15:38 | 16714823274 | 16717278558 | Ray Cruz Koku lane Agana Heights...Van |
| 2/3/2017 15:38 | 16717278558 | 16714823274 | MODEL MAKE |
| 2/3/2017 15:40 | 16714823274 | 16717278558 | Toyota Sienna |
| 2/7/2017 11:39 | 16714823274 | 16717278558 | I m in a meeting. |
| 2/7/2017 11:42 | 16717278558 | 16714823274 | CALL URGENT REGARDING PROBATION OFFICERS INVOLVE IN SELLING METH |
| 2/7/2017 16:07 | 16714823274 | 16717278558 | I m in a meeting. |
| 2/9/2017 12:00 | 16714823274 | 16717278558 | Could you s |
| 2/9/2017 12:01 | 16717278558 | 16714823274 | WHAT |
| 2/9/2017 12:01 | 16714823274 | 16717278558 | Set up the surveillance team at Kin |

Case 1:18-mj-00100   Document 1   Filed 08/06/18   Page 19 of 52

| | | | Berens sons residence in Malojloj |
|---|---|---|---|
| 2/9/2017 12:01 | 16714823274 | 16717278558 | Belens |
| 2/9/2017 12:01 | 16714823274 | 16717278558 | The drug house in Malojloj |
| 2/9/2017 12:02 | 16714823274 | 16717278558 | I ll have them meet with you next week |
| 2/9/2017 12:02 | 16714823274 | 16717278558 | SIS |
| 2/9/2017 12:04 | 16714823274 | 16717278558 | Yes or no |
| 2/9/2017 12:07 | 16714823274 | 16717278558 | Sorry  I can t talk right now. Call back later. |
| 7/13/2017 10:58 | 16714823274 | 16717278558 | Hendrick Deboer 167 Tun Ramon Street in Tumon 689-9674 |
| 7/13/2017 10:59 | 16714823274 | 16717278558 | That is registered owner for sentra in Malojloj |
| 10/5/2017 2:58 | 16717278558 | 16714823274 | PRIM THIS IS THE CASE NUMBER I7 26362 PRIORITIZE THIS PLS |
| 10/5/2017 12:08 | 16717278558 | 16714823274 | PRIM DID U GET MY TEXT |
| 10/6/2017 13:24 | 16714823274 | 16717278558 | I ll call you back later. |
| 10/6/2017 13:27 | 16714823274 | 16717278558 | I got the report I have to reassign the case because Veluz was transferred |
| 10/6/2017 13:28 | 16714823274 | 16717278558 | I ll call u back when I m clear |
| 12/17/2017 17:14 | 16717278558 | 16714823274 | PRIM WE MIGHT HAVE RONNIE SANCHEZ TOMR CALL ME TONITE |
| 12/28/2017 12:01 | 16714823274 | 16717278558 | I ll call you back later. |
| 12/28/2017 16:29 | 16714823274 | 16717278558 | They did not find him at Sheraton |
| 12/28/2017 16:31 | 16714823274 | 16717278558 | They are still pulling surveillance |

37. Throughout the text messages, MANTANONA and Captain KD refer to each other as "prim". I know that "prim" is short for "primu" in Chamorro which means "cousin". Additionally, MANTANONA texted Captain KD on October 13, 2016, stating "CALL ME CUS ONE OF OUR FAMILY PASSED AWAY ASAP". I believe MANTANONA'S use of the word "prim" and his texts relaying the status of "our family" strongly suggest MANTANONA and Captain KD are related.

38. In reviewing the above text messages, I believe MANTANONA obtains sensitive law enforcement information from Captain KD. On September 12, 2016, MANTANONA appears to

19

be seeking vehicle registration information from Captain KD at (671) 482-3274. Captain KD asks MANTANONA to clarify if the vehicle MANTANONA is interested in is a "gray Nissan sentra". MANTANONA then asks "who is the registered owner" and Captain KD responds "John Sarmiento." Captain KD then stated that the information was wrong.

39. On October 10, 2016, MANTANONA tells Captain KD "PRIM CHECK ON THAT I ASK U ABOUT THE CASE" and Captain KD responds, "Yes." MANTANONA then texts "OK I WILL GUIDE HIM HOW TO DO IT AND SHOW THE LOCATION AND WHERE THE WITNESSES STAY AND WHEN THEY RECOVER THE BACKHOE". Based on my training and experience, I believe MANTANONA was asking Captain KD for information regarding a case that MANTANONA previously inquired about. I also believe MANTANONA was stating he would provide information to Captain KD about a missing backhoe and the location of witnesses.

40. On October 13, 2016, Captain KD texts MANTANONA and informs him that "Reyes" will call MANTANONA "after the execution of a warrant this morning". On December 12, 2016, Captain KD informs MANTANONA about an individual who was "arrested and confined". On February 3, 2017, at 1317 MANTANONA placed a call to Captain KD. Captain KD texts MANTANONA at 1538 "Ray Cruz Koku lane Agana Heights...Van". MANTANONA then requests the "MODEL MAKE" of the vehicle and Captain KD responds "Toyota Sienna". Based on my training and experience, I believe the above texts are indicative of Captain KD providing sensitive law enforcement information to MANTANONA to include timing of warrants, confinement status of individuals and vehicle descriptions.

41. On February 7, 2017, at 1142 MANTANONA texts Captain KD stating "CALL URGENT REGARDING PROBATION OFFICERS INVOLVE IN SELLING METH". Later

20

that day, at 1611, Captain KD made a call to MANTANONA. I know that on February 1, 2017, Guam Department of Corrections ("GDOC") Corrections Officer (CO) Ronald Artero PEREIRA was arrested on-duty, while attempting to smuggle controlled substances and prison contraband into the GDOC Detention Center in Mangilao, Guam.

42. On February 9, 2017, Captain KD texted MANTANONA to "Set up the surveillance team at Kin Berens sons residence in Malojloj". Captain KD then corrected the name from "Berens" to "Belens" and further described the surveillance location as "The drug house in Malojloj".

43. On July 12, 2017, at 6:40 p.m., MANTANONA placed a call to Captain KD. On July 13, 2017, at 10:58 a.m., Captain KD texts MANTANONA "Hendrick Deboer 167 Tun Ramon Street in Tumon 689-9674" and "That is registered owner for sentra in Malojloj". Based on my training and experience, I believe MANTANONA requested information from Captain KD and Captain KD provided a Nissan Sentra registered owner's name, address and phone number to MANTANONA.

44. Based on my training, education, and review of the above text messages, I believe MANTANONA makes payments to Captain KD. On December 25, 2016, Captain KD tells MANTANONA "prim merry christmas to u and ur family prim am inspecting gift from u and what u owed me pay off coming prim I promised u I would not bother u". On December 31, 2016, Captain KD tells MANTANONA "prim u have 3 an a half hours to pay up please prim and jan 2 2o17 u can open new account happy new year to u and ur family". MANTANONA later responds "can I come and pick up the pay I met with gdoe alexis ada". On January 16, 2017, Captain KD texts MANTANONA "You still owe me...hahaha". Based on my training, experience, I believe Captain KD was requesting payment from MANTANONA on Christmas,

21

New Year's Eve and on January 16, 2017.

45. On December 17, 2017, MANTANONA texts, "PRIM WE MIGHT HAVE RONNIE SANCHEZ TOMR CALL ME TONITE." An internet search of "Guam" and "Ronnie Sanchez" revealed a Pacific Daily News article reporting that Ronnie Sanchez was arrested by GPD the weekend of December 30, 2017, and charged with nine counts of burglary, including the burglary of Core Tech International Chairman Ho Sang EUN's ("EUN") home on November 17, 2017. The article reported $20,000 in cash and $80,000 worth of jewelry was taken during the burglary at EUN's home. On December 28, 2017, Captain KD texts MANTANONA at TARGET PHONE, "They did not find him at Sheraton" and "They are still pulling surveillance." Based on my training and experience, I believe the texts and call logs are evidence that Captain KD is providing GPD case sensitive information to MANTANONA regarding the GPD manhunt for Ronnie Sanchez, a suspected serial burglar.

46. Throughout the time period, MANTANONA attempts to call Captain KD or texts requests for Captain KD to contact him. Captain KD frequently texts back that he will call back later. Based on my training, education, discussions with Special Agent Joseph and review of the text messages and call detail records, I believe that MANTANONA requests sensitive law enforcement investigative information from Captain KD and some of the information requested by MANTANONA pertains to drug investigations. I believe that Captain KD provides law enforcement sensitive information to MANTANONA. Captain KD provides MANTANONA the information, in part, via text and very likely via phone calls. Additionally, I believe that MANTANONA makes payments to Captain KD. I further believe that Captain KD allows MANTANONA to actively participate in GPD investigations and operations despite being a private investigator for defense attorneys and retired from the department for approximately 30

22

years.

## G. MANTANONA'S Knowledge of and Participation in Drug Trafficking Activity

### *Consensually Recorded Call with MANTANONA on February 1, 2018*

47. On February 1, 2018, CS #2 had a consensually recorded phone conversation with MANTANONA, who was using TARGET PHONE. During the call, the following conversation occurred:

| CS #2: | Hey, yeah so Redd she told me to call you. |
|--------|---------------------------------------------|
| MANTANONA: | Yeah let me uh I mean… you want uh… you going to hire me or what? |
| CS #2: | Um yeah… so let's see… Why? What's the word right now? Are they looking into me already? |
| MANTANONA: | No. |
| CS #2: | Oh la nai. I thought already I was like holy shit. I just get started and already they're looking into me already. (Laughing) |

48. Based on my experience, knowledge of the case and discussions with Special Agent Joseph, I know that, in the conversations, "Boom" is a nickname for MANTANONA and "Redd" is a nickname for WOLFORD. After CS #2 says WOLFORD told him/her to call, MANTANONA responds, "Yeah let me uh I mean… you want uh… you going to hire me or what?" I believe MANTANONA is asking CS #2 if he is going to buy protection from MANTANONA. CS #2 then asks, "Um yeah… so let's see… Why? What's the word right now? Are they looking into me already?" MANTANONA responds, "No." I believe CS #2 is asking MANTANONA if CS #2 is on the radar of law enforcement and MANTANONA informs CS #2 in the negative. Later, CS #2 informs MANTANONA that LUJAN is his/her attorney and MANTANONA instructs CS #2 not to tell LUJAN that CS #2 is hiring MANTANONA.

49. Also during the call, the following conversation took place:

23

| MANTANONA: | You know. So, if I heard, hear your name nai… |
|---|---|
| CS #2: | Yeah. |
| MANTANONA: | Then I have to call you right away. |
| CS #2: | Okay. |
| MANTANONA: | You know, and then I'll call you right away and say I want to meet with you right away. |
| CS #2: | Okay. |
| MANTANONA: | Then… So… So, why you calling me bra? |
| CS #2: | Well, no cause um, you know, Redd said that um I'm already I'm out there. My name is on the street already, that they're gonna, that they're gonna, they're planning a hit on me already. So… |
| MANTANONA: | Mmm hmm. |
| CS #2: | Uh, which is kinda weird because Ianya I didn't even put my name out there yet that I'm… that I'm going again and already people are talking that they're going to do a hit. So… she said, you know, to call you and get you for my protection nai. See me, I want the same protection that that Jovin got. (Laughs) |
| MANTANONA: | Yeah, but see… once you talk behind my back nai brut… |
| CS #2: | Oh, so even him too? |
| MANTANONA: | Yeah, but you know when you talk behind my back and somebody of your friend told me nai… |
| CS #2: | Ahhhh. |
| MANTANONA: | That's it. That's it for, for him on me. I don't give a shit, that's my attitude. Okay? |
| CS #2: | Okay. |
| MANTANONA: | But when you don't backstab me… then I can represent… |
| CS #2: | (Unintelligible – simultaneously talking) |
| MANTANONA: | …uh you know. So, I don't, when I couldn't do it, I could I I don't… Every time they're gonna to hit his house, I have to go… go to his house in Agat… every time, because CHACO always go and claim money at Jovin that oh Boom did not tell you?… that they're going to raid your house uh tonight? |
| CS #2: | Yeah. |
| MANTANONA: | So, Jovin get panic… panic, panic. So, he call me hey Uncle Boom, Uncle Boom, how come uh CHACO uh came and he's asking me, you know, tells him that they're going to raid. So I went, I went down to Agat. I straight all the way up go to ileku Jovin, "What the fuck?" Well, I then, even the search, the warrant, even though you call (unintelligible) |

24

| | |
|---|---|
| | up on my cell, we can't do because we are arrested for obstruction. |
| CS #2: | Yeah. |
| MANTANONA: | But you know CHACO just wanna get money from you. And then for me to come all the way, all the way to your place to, to babysit you… |
| CS #2: | (Laughs) |
| MANTANONA: | I told you, you watch, because you have a lot of friends, but you don't know how many friends were picked up already. |
| CS #2: | Yep. |

50. MANTANONA tells CS #2, "You know. So, if I heard, hear your name nai… Then I have to call you right away." MANTANONA further states, "You know, and then I'll call you right away and say I want to meet with you right away." Based on my experience, MANTANONA is saying that if CS #2 hires MANTANONA for protection, MANTANONA would warn CS #2 if MANTANONA knew the police were looking at CS #2.

51. CS #2 tells MANTANONA, "See me, I want the same protection that that Jovin got." By "Jovin", CS #2 is referring to Jovin SANTOS ("SANTOS"), a well-known drug dealer in Agat. CS #2 is asking MANTANONA for a high level of protection, the same level of protection that MANTANONA provided to SANTOS. MANTANONA replies, "Yeah, but see… once you talk behind my back nai brut," and then continues, "Yeah, but you know when you talk behind my back and somebody of your friend told me nai…" MANTANONA then states, "That's it. That's it for, for him on me." MANTANONA is acknowledging he protected SANTOS but stopped after SANTOS spoke badly of MANTANONA.

52. MANTANONA tells CS #2, "Every time they're gonna to hit his house, I have to go… go to his house in Agat… every time, because CHACO always go and claim money at Jovin that oh Boom did not tell you?… that they're going to raid your house uh tonight?" MANTANONA further states, "So, he call me hey Uncle Boom, Uncle Boom, how come uh

25

CHACO uh came and he's asking me, you know, tells him that they're going to raid. So I went, I went down to Agat. I straight all the way up go to ileku Jovin, 'What the fuck?' Well, I then, even the search, the warrant, even though you call (unintelligible) up on my cell, we can't do because we are arrested for obstruction." MANTANONA continues, "But you know CHACO just wanna get money from you. And then for me to come all the way, all the way to your place to, to babysit you…" Based on my knowledge of the case and experience, MANTANONA is stating that an individual named "CHACO" was paying MANTANONA for protection. When MANTANONA warned CHACO about planned police warrant executions at SANTOS' home, CHACO would inform SANTOS, who was not paying for MANTANONA'S protection at the time. Afterwards, SANTOS called MANTANONA to try and verify the information from CHACO. MANTANONA then had to go to Agat and tell CHACO not to inform others of planned police raids otherwise CHACO and MANTANONA could be arrested for obstruction of justice.

53. Also during the call between CS #2 and MANTANONA on February 1, 2018, MANTANONA states that he provides protection from law enforcement for Vince MENDIOLA and another person with the first name of "Pete".

***Consensually Recorded Call with WOLFORD on February 8, 2018***

54. On February 8, 2018, CS #2 had a consensually recorded phone conversation with WOLFORD, who, at the time, was using phone number (671) 686-7427. During the call, the following conversation occurred:

| CS #2: | So what do you think - Your uncle can…help me out of the situation I'm in or what? |
|---|---|
| WOLFORD: | Which…what? The situation you're in? |
| CS #2: | I don't - I don't - |

26

| | |
|---|---|
| WOLFORD: | Are - he's helping you out of - of -- it's stuff that you're - you're - you're - you're [unintelligible] that's what he's helping you with. |
| CS #2: | Oh, can help me with the stuff that's going to happen? |
| WOLFORD: | Yes. He's going to do [unintelligible] you - it's - is - is work really - You're really not receiving anything, but, what I heard - We shipping everything out at [unintelligible] nothing happens. That's how far it can go. |
| CS #2: | And then he's going to make sure he's got that much protection...around that? |
| WOLFORD: | Yes. And what he did for me when I'm at my house. |
| CS #2: | Man. |
| WOLFORD: | He'll give you heads up over all the raids are going to happen. He'll give you a head's up if anything - if they're - if they're shut down - [unintelligible] how long. |
| CS #2: | Yeah - If he's not - if he hasn't been in the force for that long, how the hell does he know all that? |
| WOLFORD: | [unintelligible] Yeah, he's been on the force that long, he's just a retired cop, 30 years. |
| CS #2: | He told me - |
| WOLFORD: | He's a -- |
| CS #2: | [overlapping voices] Yeah. He told me he's a retired cop 30 years, so how the hell does he know when it's going to happen or what's going to happen? That's what - |
| WOLFORD: | [overlapping voices] He has someone inside, inside, inside. |
| CS #2: | Who nai? |
| WOLFORD: | I don't know. |
| CS #2: | Shit. |
| WOLFORD: | He has someone in there. He's actually the right hand for the governor - he's the right hand for the chief of police. |
| CS #2: | Oh really? So that's how - |
| WOLFORD: | Yes. |
| CS #2: | - that's how high his - his connect goes? |
| WOLFORD: | Yes! That's how far [unintelligible] every time when they need something done or - they need a decision, they call him. |
| CS #2: | Oh. Okay so then maybe - |
| WOLFORD: | [overlapping voices] I had - they had to raid, like the time [unintelligible] Nevermind Road [unintelligible] raid [unintelligible] and I called him up and said, "Uncle you - can you disregard that?" And he turned around and said, "Red... give me someone to raid." I said, "uh... Mark Mayo." Then they did it. |
| CS #2: | Oh. Okay. So... |
| WOLFORD: | Because Mandana knows not better - they know better not to ask for my - ask about my -- you know better, not to say my name. |
| CS #2: | [laughter] |

27

| | |
|---|---|
| WOLFORD: | Because my uncle [unintelligible] he's like - you know? You already know that…I'm close to him so he - they'll just say tell your niece…stop. Like that. But we have to [unintelligible] - we have to - you know, pay… at least seven percent. I'm paying like uh…almost fifteen thousand. |
| CS #2: | Oh, [unintelligible] yeah? So looks like [unintelligible] - |
| WOLFORD: | [simultaneous conversation] [unintelligible] |
| CS #2: | [simultaneous conversation] [unintelligible] better property then, right? |
| WOLFORD: | You're going to give him your property? [laughter] |
| CS #2: | [laughs] Okay well tell him - |
| WOLFORD: | [overlapping voices] He called! |
| CS #2: | [unintelligible] |
| WOLFORD: | He called and he and said [unintelligible] - Uncle. I need you to understand the situation [unintelligible] going on right now. Which you see. [unintelligible] |
| CS #2: | M-hum. |
| WOLFORD: | [unintelligible] |
| CS #2: | Yep. |
| WOLFORD: | I don't know what you talk to him about - I don't understand what he [unintelligible] you know? Especially about…I never told you yet, but - did he tell you yet? About you? |
| CS #2: | So how much do you think I'm going to need to pay him? |
| WOLFORD: | He said whatever. |
| CS #2: | What's whatever, man? I don't want to go in and - |
| WOLFORD: | [overlapping voices] Whatever you have - whatever. |
| CS #2: | [overlapping voices] Yep, Yep. |
| WOLFORD: | [overlapping voices] at least that's what he said. That's when I asked him, I said, "Well how much of this do you want?" And he answered and he goes "Whatever he - he can do." That is it. |
| CS #2: | Man, because you know if I go to him for like a thousand dollars he's going - I don't want him to laugh at my ass. I want him to be like, oh yeah - |
| WOLFORD: | [overlapping voices] Excuse me. He's not like that. |
| CS #2: | Are you sure? So I can go to him with - |
| WOLFORD: | [simultaneous conversation] Yes I'm - I pos - |
| CS #2: | [simultaneous conversation] [unintelligible] and he'll be - |
| WOLFORD: | I'm positive. You know I've been paying him? I've been paying like two thousand every week. |
| CS #2: | Okay. I don't - I mean I guess I guess, I guess let me - let me come up with something man and then I'll - I'll - |
| WOLFORD: | [overlapping voices] I - I - I -- we - we do that in sessions so…you know? |
| CS #2: | So but what do you think, okay a thousand now and then what's going to be like the total amount? Fifteen grand? |

28

| WOLFORD: | Uhuh, I - I - no I - think [unintelligible] that one I'll tell you later but - I was doing it like every two weeks I was paying him two fives - two fives every two weeks. And [unintelligible] he just set price [unintelligible] - so - so you're - you want to [unintelligible] Uncle pay that [unintelligible] the security at my [unintelligible] house? He goes - never mind just do a one time shot [unintelligible] try to help me with the [unintelligible] twenty-five grand. But I did it in installments. But I threw them off for twenty-five grand, true story. In Inarajan. |
|---|---|
| CS #2: | [laughter] Yeah. Okay. |

55. Based on my training, knowledge of the case and discussions with Special Agent Joseph, I know that CS #2 and WOLFORD are referring to MANTANONA as "Uncle" in the above conversation. When CS #2 asks, "Oh, can help me with the stuff that's going to happen?," I know that CS #2 is asking WOLFORD if MANTANONA can help CS #2 thwart future law enforcement actions against him/her related to drug trafficking activities. WOLFORD responds, "Yes. He's going to do [unintelligible] you - it's - is - is work really - You're really not receiving anything, but, what I heard - We shipping everything out at [unintelligible] nothing happens. That's how far it can go." CS #2 then asks, "And then he's going to make sure he's got that much protection…around that?" WOLFORD responds, "Yes. And what he did for me when I'm at my house." WOLFORD further states, "He'll give you heads up over all the raids are going to happen. He'll give you a head's up if anything - if they're - if they're shut down - [unintelligible] how long." Based on my training, experience and knowledge of the case, I believe when WOLFORD says, "We shipping everything out at [unintelligible] nothing happens." and "that's how far it can go," WOLFORD is stating that MANTANONA will ensure there are no law enforcement actions if drug shipments are intercepted by law enforcement. I further believe WOLFORD is telling CS #2 that MANTANONA prevented law enforcement from taking further actions against her after police raided WOLFORD'S home in the past.

56. WOLFORD states, "He'll give you heads up over all the raids are going to happen.

29

He'll give you a head's up if anything - if they're - if they're shut down - [unintelligible] how long." I believe WOLFORD is stating the MANTANONA will provide CS #2 with sensitive law enforcement information, including any searches or arrests that would affect CS #2, in a timely manner that would allow CS #2 to destroy or hide evidence from law enforcement.

57. When CS #2 presses WOLFORD on how MANTANONA could know about law enforcement actions when he has been retired from GPD for 30 years, WOLFORD responds, "He has someone inside, inside, inside." I believe WOLFORD is informing CS #2 that MANTANONA knows about law enforcement investigations and operations because MANTANONA is being passed this information from contacts with an employee working at GPD. WOLFORD states that she does not know who MANTANONA's connection at GPD is. WOLFORD further states, "He has someone in there. He's actually the right hand for the governor - he's the right hand for the chief of police" and "Yes! That's how far [unintelligible] every time when they need something done or - they need a decision, they call him." I believe that WOLFORD is advising CS #2 that in addition to MANTANONA's GPD contact, MANTANONA is very close with the Governor of Guam Eddie Calvo (Governor) and GPD Chief of Police Joseph Cruz (Chief Cruz) and that both Governor and Chief Cruz seek MANTANONA's input on important decisions.

58. WOLFORD states, "I had - they had to raid, like the time [unintelligible] Nevermind Road [unintelligible] raid [unintelligible] and I called him up and said, Uncle you - can you disregard that? And he turned around and said, "Red... give me someone to raid." I said, "uh... Mark Mayo." Then they did it." I believe WOLFORD is telling CS #2 that MATANONA informed WOLFORD that law enforcement was going to execute a search warrant at a location on or near Nevermind Road and WOLFORD asked MANTANONA to intervene and stop police

30

from raiding the location. I further believe WOLFORD was stating that MANTANONA requested WOLFORD provide a name of another drug trafficker for law enforcement to redirect its attention to and WOLFORD provided MANTANONA with the name "Mark Mayo". An internet search of "Guam" and "Mark Mayo" revealed a Guam Daily Post article titled, "4 suspects arrested in drug bust". The article lists four individuals, to include Mark Anthony MAYO, who were arrested on drug charges pursuant to a search warrant executed by GPD Mandana on May 2, 2017. GPD Mandana seized an undisclosed amount of methamphetamine, drug paraphernalia and marijuana during the search.

59. WOLFORD states, "Because Mandana knows not better - they know better not to ask for my - ask about my -- you know better, not to say my name" and "Because my uncle [unintelligible] he's like - you know? You already know that…I'm close to him so he - they'll just say tell your niece…stop. Like that. But we have to [unintelligible] - we have to - you know, pay… at least seven percent. I'm paying like uh…almost fifteen thousand." Based on my training, experience, knowledge of the case and discussions with Special Agent Joseph, I believe WOLFORD is stating that she is close with MANTANONA, who has connections with powerful people like the Governor and Chief Cruz. I believe WOLFORD is further stating that members of GPD Mandana are afraid to target WOLFORD's drug trafficking activities because of WOLFORD's close relationship with MANTANONA. WOLFORD is further stating that if WOLFORD's drug trafficking activities draw law enforcement attention, GPD Mandana members will notify MANTANONA and ask him to caution WOLFORD. WOLFORD adds that the protection MANTANONA provides is not free, but costs her at least seven percent of her drug proceeds. WOLFORD states that she has paid MANTANONA at least $15,000 to date.

31

60. CS #2 asks WOLFORD, "So how much do you think I'm going to need to pay him?"
I believe CS #2 is asking WOLFORD how much he/she should pay MANTANONA in order for
MANTANONA to provide protection from law enforcement for CS #2. WOLFORD responds
that she spoke with MANTANONA about a payment amount from CS #2 and MANTANONA
told her, "Whatever he - he can do." WOLFORD then states, "You know I've been paying him?
I've been paying like two thousand every week." She goes on to say, "I was doing it like every
two weeks I was paying him two fives - two fives every two weeks. And [unintelligible] he just
set price [unintelligible] - so - so you're - you want to [unintelligible] Uncle pay that
[unintelligible] the security at my [unintelligible] house? He goes - never mind just do a one time
shot [unintelligible] try to help me with the [unintelligible] twenty-five grand. But I did it in
installments. But I threw them off for twenty-five grand, true story." I believe WOLFORD is
stating she paid MANTANONA $2,000 every week. WOLFORD then clarifies she was paying
MANTANONA "two fives every two weeks" or two payments of $500 every two weeks, about
$2,000 every month. I believe WOLFORD then advises she was making multiple installment
payments to MANTANONA. MANTANONA ultimately requested a one-time payment of
$25,000 from WOLFORD in order to protect WOLFORD from law enforcement in a specific
matter. WOLFORD advises she made the $25,000 payment to MANTANONA and,
consequently, she was able to evade any negative law enforcement actions on that matter.

***Consensually Recorded Call with MANTANONA on April 25, 2018***

61. On April 25, 2018, CS #2 had a consensually recorded phone conversation with
MANTANONA, using TARGET PHONE. During the call, CS #2 asks if he/she can meet with
MANTANONA that Friday and says "See that's what I was going to ask you nai cause, man you
know what, is it safer for me to bring by myself or – do – do you have somebody up at the

airport I can – I can check or is it something where post office or the port? I need nai advice, nai? Because lanya this is – this is – a good nai? This is a good." I know CS #2 is asking MANTANONA if it would be safe for him/her to transport a large quantity of methamphetamine on his person through the airport and if MANTANONA has someone at the airport, post office or port that will help him smuggle the drugs into Guam.

62. MANTANONA later suggests meeting at Onward Golf Course in Talafofo and says, "But then get some eh. Okay?" and then "Make sure you get some okay?" Based on my training and experience, I know that MANTANONA is telling CS #2 to make sure he/she brings money to the meeting to pay MANTANONA for protection.

***Consensually Recorded Meeting with MANTANONA on April 27, 2018***

63. On April 27, 2018, MANTANONA met with CS #2 at the Onward Golf Course in Talafofo. I observed MANTANONA, driving a 2015 Lexus ES 350 bearing Guam license plate number SJ 2912, pull into the golf course parking lot and park in a stall near the front door of the clubhouse. I observed MANTANONA exit the Lexus and greet CS #2. I observed them both walk into the clubhouse. The meeting was consensually recorded by CS #2. During the meeting, the following conversation occurred:

| CS #2: | If I have to go back again... I was hoping nai maybe you knew somebody at the airport or... |
|---|---|
| MANTANONA: | [unintelligible] |
| CS #2: | No. Okay. So carrying is out of the question? |
| MANTANONA: | Mmm hmm. Cause they, they know you. |
| CS #2: | Yeah. |
| MANTANONA: | Unless somebody going to do it. |
| CS #2: | Man, I was hoping you had somebody there at front or at, at the line nai. |

33

| | |
|---|---|
| MANTANONA: | Yeah. But what I'm saying is… you go in that line, you don't know if the DEA and the task force and the customs… |
| CS #2: | Oh. (talking simultaneously) |
| MANTANONA: | …are there. Even though you control the line… |
| CS #2: | Mmm hmm. |
| MANTANONA: | They can stop you right there right [unintelligible] and make you go [unintelligible] |
| CS #2: | Really? |
| MANTANONA: | Yeah. But you can see they call it catwalk. |
| CS #2: | Yeah. |
| MANTANONA: | You can't see them, but they can see you. |
| CS #2: | Ohhhhh. |
| MANTANONA: | See? You know what I'm saying? |
| CS #2: | Yeah. |
| MANTANONA: | You, you can't see them. So, even though I said, "Good to go on that"… |
| CS #2: | Mmm hmm. You can always stop from the secondary. |
| MANTANONA: | Cause they watching. |

64. Based on my training, experience and discussions with other agents, in the above discussion, MANTANONA is warning CS #2 against carrying drugs on his person and flying into Guam International Airport. MANTANONA states that even if MANTANONA had a conspirator in Guam Customs and Quarantine that could waive CS #2 through an inspection line, there would be no way for CS #2 to tell if the DEA or other law enforcement agency was there to intercept CS #2. MANTANONA further states that another law enforcement officer could direct CS #2 to another inspection line or order CS #2 to a secondary inspection.

65. Later in the same meeting, the following discussion took place:

34

| MANTANONA: | You know, you know who snitched on you? |
|---|---|
| CS #2: | Who? |
| MANTANONA: | This is money… and uh protection too. Pangelinan… You know who I'm talking about. |
| CS #2: | Yeah. |
| MANTANONA: | Cause I tell you brother [unintelligible] |
| CS #2: | Bird brain? |
| MANTANONA: | Huh? |
| CS #2: | Si Eric? |
| MANTANONA: | Eric. He burned your ass. |
| CS #2: | Yeah, he did. |
| MANTANONA: | I'm not saying that I told you, but… he's the CI. |

66. Based on my training, experience and discussions with other agents, I know that, in the above discussion, MANTANONA offers to tell CS #2 the identity of the confidential informant ("CI") who "snitched" on CS #2. MANTANONA tells CS #2 that the identity will cost CS #2 "money" and the information is the type of "protection" that MANTANONA offers. MANTANONA informs CS #2 that Eric PANGELINAN was the "snitch" who reported CS #2 to law enforcement. MANTANONA tells CS #2, "He burned your ass." I know that CS #2 has been indicted on drug charges.

67. Also during the meeting, the following conversation took place:

| CS #2: | Okay. I just hope the address that she gave is good. |
|---|---|
| MANTANONA: | You see the trick of the Tamuning [unintelligible]? I'm the one that broke that. |
| CS #2: | Mmm hmm. |
| MANTANONA: | They use dead people that still own the box. |

| CS #2: | Ohh. |
|--------|------|
| MANTANONA: | And they know the number. |
| CS #2: | Yeah. |
| MANTANONA: | It's another way, but it's in Tamuning that they've been putting it out. [unintelligible] |
| CS #2: | Man, I just hope Red too is good. |
| MANTANONA: | But, the big nai you're trying to… |
| CS #2: | Yeah. She can use that nai. |
| MANTANONA: | You can, don't carry. They know you're a target already. |
| CS #2: | How about if I bring a female or somebody else? |
| MANTANONA: | No. They know that… |

68. Based on my training, experience and discussions with other agents, I know the above conversation is a drug discussion. When CS #2 says, "I just hope the address that she gave is good," CS #2 is saying that CS #2 obtained an address to send drugs to from WOLFORD (referred to as "Redd"), and CS #2 hopes the address provided by WOLFORD would not raise law enforcement scrutiny. MANTANONA then asks, "You see the trick of the Tamuning [unintelligible]?" MANTANONA then says, "They use dead people that still own the box… and they know the number." MANTANONA is informing CS #2 that certain drug traffickers are bringing drugs into Guam through the U.S. mail via P.O. boxes at the Tamuning Post Office that are assigned to people who are now deceased. MANTANONA advises it could be a way that CS #2 smuggles drugs onto the island. MANTANONA then warns CS #2 against personally carrying drugs through the airport. When MANTANONA says "they know you're a target already," MANTANONA is referring to law enforcement as "they" and MANTANONA further knows CS #2 has been charged with drug violations and is under law enforcement scrutiny. CS #2 then asks, "How about if I bring a female or somebody else?" CS #2 is asking if it would be

36

advisable to have someone else, like a female, carry the drugs through the airport.

MANTANONA replies, "No. They know that…" When MANTANONA says "They know

that," I believe MANTANONA means law enforcement is aware of known drug traffickers using

unknown individuals (or mules) to carry drugs on their person into ports of entry.

69. Also during the same meeting, the following conversation took place:

| CS #2: | How about the port? Port is too uh like tar. That's too hard no? |
|---|---|
| MANTANONA: | They're watching AJ Mendiola. He works for the port. |
| CS #2: | Ah shit. Tell him to move. (Laughs) Okay, so that one's done. |
| MANTANONA: | [unintelligible] Darell is there. AJ's uh enforcer. |
| CS #2: | Mmm hmm. |
| MANTANONA: | [unintelligible] is there working. |
| CS #2: | Dasto |
| MANTANONA: | So, they're focusing on him already. |
| CS #2: | Okay, so… How about like Dewitt, or DHL, Triple B? |
| MANTANONA: | [unintelligible] |
| CS #2: | You like that one better? |
| MANTANONA: | Yeah. Like always remember, there's somebody looking. [unintelligible] |
| CS #2: | Mmm hmm. |
| MANTANONA: | Pick up your packets. That's what I'm saying. I'm telling you this. Order, not under your name… |
| CS #2: | Okay. |
| MANTANONA: | Don't order under your name. |
| CS #2: | Yeah |
| MANTANONA: | But order something that uh… Order somethings for your kids. |

Case 1:18-mj-00100   Document 1   Filed 08/06/18   Page 38 of 52

| CS #2: | Mmm hmm. |
|---|---|
| MANTANONA: | And then uh, if they, let's see they intercept that. And he or she [unintelligible] to you, say, "I didn't order that shit." Remember, remember when you're doing your packets... |
| CS #2: | Yeah. |
| MANTANONA: | [unintelligible] |
| CS #2: | Yeah, yeah, yeah, yeah. |
| MANTANONA: | Include your [unintelligible]. He said, "No. I ordered, I ordered for my kids." |
| CS #2: | Yeah. |
| MANTANONA: | [unintelligible] Other than that I don't know where the fuckin' packet [unintelligible]. |
| CS #2: | Okay. |
| MANTANONA: | You, you, you beat this, you beat the system. But if you, you, order it and it goes to you then there's uh going to be a... |
| CS #2: | Yeah. |
| MANTANONA: | ... problem [unintelligible]. |
| CS #2: | Okay. |

70. Based on my training, experience and discussion with other agents, the above discussion is a drug conversation. CS #2 asks MANTANONA about bringing drugs in through the port. MANTANONA cautions against bringing drugs in through the port and says, "They're watching AJ Mendiola. He works for the port." MANTANONA continues saying, "Darell is there. AJ's uh enforcer." MANTANONA is saying law enforcement is watching MENDIOLA and Darell, who is MENDIOLA's enforcer. Therefore, MANTANONA does not think bringing drugs through the port would be advisable.

71. MANTANONA says, "Pick up your packets. That's what I'm saying. I'm telling you this. Order, not under your name." When MANTANONA says "packets", he is referring to mailings containing drugs. MANTANONA then tells CS #2 not to use his name on any mailings

38

with drugs in them. MANTANONA advises CS #2 to order something for CS #2's kids at the same time drugs are being shipped to CS #2. MANTANONA advises this will give CS #2 cover in case the drug shipment is intercepted and is somehow linked to CS #2. MANTANONA states if these precautions are taken "You, you, you beat this, you beat the system. But if you, you, order it and it goes to you then there's uh going to be a... problem."

72. Later during the same meeting, the following conversation took place:

| MANTANONA: | So, you can do anytime... |
|---|---|
| CS #2: | Anytime. Yeah, yeah. No. Anytime. I could meet tomorrow if I want. |
| MANTANONA: | But do you have somebody who can [unintelligible] together like that, you know? Or send it through DHL? |
| CS #2: | Okay if I send it through DHL? |
| MANTANONA: | Or send it to the mail. You know [unintelligible]. |
| CS #2: | Well see, I'm working [unintelligible] comes in, no problem. Then maybe. I was thinking nai of the [unintelligible] |
| MANTANONA: | [unintelligible]. Do you know somebody there? |
| CS #2: | I have the box number and everything. She's the one that gave me the box number. |
| MANTANONA: | Yeah and that would be good. |
| CS #2: | [unintelligible] straight to [unintelligible]? |
| MANTANONA: | Yeah. |
| CS #2: | Because [unintelligible] the thing about that would be better than cause she gave me also a Talofofo address. I don't know who in Talofofo. |
| MANTANONA: | I know. |
| CS #2: | You know? Oh, so... |
| MANTANONA: | Yeah. [unintelligible] |
| CS #2: | If anything too, maybe, maybe I split it, maybe I split it. |
| MANTANONA: | Yeah. |

| CS #2: | I just go same thing [unintelligible] that one to this one. |
|---|---|
| MANTANONA: | Split it. Split it the best. Hopefully everything uh goes uh. |

73. Based on my training, experience and discussions with other agents, the above conversation is a drug discussion about CS #2 sending drugs in the mail. MANTANONA asks when CS #2 can send the drug shipments and CS #2 responds, "Anytime. Yeah, yeah. No. Anytime. I could meet tomorrow if I want." CS #2 further states, "I have the box number and everything. She's the one that gave me the box number." CS #2 is saying that WOLFORD provided CS #2 with a P.O. box number of where to ship drugs. CS #2 also says, "she gave me also a Talofofo address. I don't know who in Talofofo." MANTANONA replies, "I know." CS #2 is saying that WOLFORD also provided a Talofofo address, but CS #2 did not know who the address belonged to. MANTANONA states he does know who the address belongs to. When CS #2 says, "If anything too, maybe, maybe I split it, maybe I split it," CS #2 is saying that he is considering dividing the large drug packet into smaller packets for shipment to Guam. MANTANONA responds, "Split it. Split it the best. Hopefully everything uh goes uh."

74. Also during the same meeting, the following discussion took place:

| MANTANONA: | Use a prepaid phone. |
|---|---|
| CS #2: | Mmm hmm |
| MANTANONA: | [unintelligible] |
| CS #2: | Okay. |
| MANTANONA: | Use a phone for your family. |
| CS #2: | Yeah. But for the other one… |
| MANTANONA: | Always remember how they, how they uh, uh, indicted the DOC guard officers… |
| CS #2: | Mmm hmm. |

40

| MANTANONA: | through the statement… |
|---|---|
| CS #2: | Yeah. |
| MANTANONA: | the call officer. |
| CS #2: | Huh. |
| MANTANONA: | See? |
| CS #2: | Yeah. |
| MANTANONA: | Like over there, we won the case… |
| CS #2: | Mmm hmm. |
| MANTANONA: | We used the prepaid. They cannot monitor. They can monitor from the… |
| CS #2: | Tower. |
| MANTANONA: | Tower, but they, jus, you know what I'm saying? |
| CS #2: | Yeah. |
| MANTANONA: | The prepaid is the best. |
| CS #2: | Yeah, I'll pick me up, I'll get me one of those. |
| MANTANONA: | Ask, the prepaid is the best. The only person tell is [unintelligible] search warrant for [unintelligible] |

75. Based on my training, experience and discussion with other agents, MANTANONA, in the above conversation, is advising CS #2 to obtain and use a prepaid cell phone for CS #2's drug activities. MANTANONA informs CS #2 that a Department of Corrections ("DOC") guard was indicted on charges related to statements on a cell phone. MANTANONA states he won a case through the use of prepaid cell phones. When MANTANONA states "They cannot monitor… They can monitor from the… tower…", MANTANONA is informing CS #2 that law enforcement will have a harder time monitoring communications if CS #2 utilizes a prepaid cell phone to communicate with MANTANONA and others.

76. Toward the end of the meeting, CS #2 paid MANTANONA $500. I know the payment was for MANTANONA to protect CS #2 from law enforcement.

41

*Consensually Recorded Call with MANTANONA on May 10, 2018*

77. On May 10, 2018, CS #2 had a consensually recorded phone conversation with MANTANONA, using TARGET PHONE. During the call, CS #2 informed MANTANONA that he/she was expecting a drug shipment in the near future and MANTANONA directed CS #2 to inform MANTANONA when the drug package arrives so he can watch for it. MANTANONA also informed CS #2 that he knows how law enforcement operates.

78. Also during the call, the following conversation took place:

| MANTANONA: | [overlapping voices] Then the guy, uh, if you transit in I have somebody already over there. You just call me. |
|---|---|
| CS #2: | Okay. |
| MANTANONA: | Try to transit it [Break] I don't know, I don't know how you are going to do it. |
| CS #2: | Okay. |
| MANTANONA: | But I want to be there in that area. |
| CS #2: | Yeah. |
| MANTANONA: | To make sure there's no unmarked car and they don't follow. |
| CS #2: | Mhm. |
| MANTANONA: | Whatever, I know it. I know all the officers. |
| CS #2: | Okay. So yeah well um, of course nai when I call I'll - if anything too nai - |
| MANTANONA: | [overlapping voices] But when - |
| CS #2: | [overlapping voices] I'll give you the tracking number nai. |
| MANTANONA: | Yeah. Alright, yeah. But use - use other phone. |
| CS #2: | Yeah, no, of course. Of course. |
| MANTANONA: | And tell Audrey uh, to be giving me some of the cash too [UI] |
| CS #2: | Oh yeah, no problem. |

79. Based on my training, experience, and knowledge of the case, I believe, in the above conversation, MANTANONA is offering "to be there in that area" when CS #2 retrieves the drug shipment. I further believe MANTANONA is offering to ensure CS #2 is not followed by police in an "unmarked car" as he "know[s] all the officers".

80. Toward the end of the conversation, MANTANONA informs CS #2 that CS #2 is not

42

on law enforcement radar.

*Consensually Recorded Calls with MANTANONA on May 22, 2018*

81. On May 22, 2018, CS #2 had a consensually recorded phone conversation with MANTANONA, using TARGET PHONE. CS #2 advised MANTANONA that a drug shipment arrived at the post office. CS #2 asked if MANTANONA could scope out the post office before his/her arrival to make sure it was clear of any law enforcement. MANTANONA advised that he had checked in with local law enforcement and that police were occupied with business on the south end of the island. MANTANONA told CS #2 he was busy at Guam Memorial Hospital and that CS #2 knew what to do. MANTANONA directed CS #2 call MANTANONA when he/she picks up the package and MANTANONA will follow CS #2 to make sure law enforcement is not following him/her.

82. Later, that same day, another consensually recorded call was held between CS #2 and MANTANONA. CS #2 advised MANTANONA that CS #2 was concerned law enforcement was watching him/her at the Post Office when he/she arrived to pick up the drug shipment. CS #2 provided MANTANONA with the license plate of a blue Mazda SUV and asked MANTANONA to run the license plate number to determine the registered owner. CS #2 also described the actions of the Mazda SUV driver which gave CS #2 concern. MANTANONA informed CS #2 that the police do not have vehicles that fit the Mazda SUV description and further stated the actions of the Mazda SUV driver were not consistent with operating tactics of law enforcement. During the call, MANTANONA stated he knows of someone and that CS #2 could drive to the post office in the person's vehicle. CS #2 asked if the person could get the package and MANTANONA responded in the affirmative. MANTANONA stated the person would not report to police.

43

83. Based on my training, experience and knowledge of the investigation, I believe the above actions show probable cause that the MANTANONA is continuing to conspire with drug traffickers in the distribution of illegal substances. The above conversations between CS #2 and MANTANONA, demonstrate MANTANONA is knowingly advising drug traffickers on law enforcement tactics and techniques in an effort to frustrate law enforcement drug fighting efforts on the island. MANTANONA also informs drug traffickers on whether they are currently being investigated by law enforcement. Further, MANTANONA offered assistance to a believed drug trafficker to ensure he/she is not followed by law enforcement after receiving a drug shipment. MANTANONA also offered to put a drug trafficker in contact with an individual who would assist in retrieving a drug package and not report to police.

## III.   PROBABLE CAUSE SUMMARY

84. Based on my knowledge and experience, the knowledge and experience relayed to me by SA Joseph, and evidence obtain through search warrants, toll records and consensually recorded conversations as summarized above, I believe there is probable cause to believe MANTANONA has requested and received sensitive law enforcement information from high-ranking employees within GPD. Specifically, there is probable cause to believe MANTANONA has requested and received information from Captain KD using TARGET PHONE (671) 727-8558.

85. Additionally, I believe there is probable cause to believe that MANTANONA communicates with drug dealers on Guam using TARGET PHONE. I further believe there is probable cause to show MANTANONA has knowledge that he is, in fact, communicating with drug dealers on TARGET PHONE (671) 727-8558. There is also probable cause to believe MANTANONA solicits drug dealers to pay him for "protection" or for information pertaining to

44

law enforcement actions regarding the drug dealers. There is probable cause to believe drug dealers have, in fact, paid MANTANONA for this "protection" or information pertaining to law enforcement investigations. There is probable cause to believe MANTANONA has provided law enforcement sensitive information to individuals he knows to be drug dealers on Guam. Further, I believe there is probable cause to show that MANTANONA has interfered with law enforcement actions to assist drug dealers in continuing their drug trafficking operations.

86. I also know that the text messages obtained by search warrants, as detailed in this affidavit, reveal a consistent pattern of ongoing drug trafficking and other illegal activities that have not ceased. Communications that reference the sale of contraband have occurred as early as September 2016 and as late as May 2018. Based on my training, experience, discussions with Special Agent Joseph, and knowledge of drug trafficking organizations, I know that it is unlikely that persons involved in drug activity will cease ongoing activity. Therefore, based on my training and experience, I believe that the drug activity will extend after May 22, 2018.

87. Agents learned that IT&E is a company that provides cellular telephone access to the general public and that stored electronic communications and texts for IT&E subscribers may be located on the computers/servers of IT&E. Furthermore, I am aware that computers located at IT&E contain information and other stored electronic information.

88. Among the services commonly offered by wireless phone providers, is the capacity to send short text or multimedia messages (photos, audio, or video) from one subscriber's phone or wireless device to another phone or wireless device via one or more wireless providers. This service is often referred to as "Short Message Service" ("SMS") or "Multimedia Messaging Service" ("MMS"), and is often referred to generically as "text messaging" or "wireless messaging."

Case 1:18-mj-00100   Document 1   Filed 08/06/18   Page 46 of 52

89. Based on my knowledge, experience and discussions with Special Agent Joseph, I believe that stored electronic communications, including SMS and MMS messages that have been sent or received by subscribers, may be stored by IT&E for periods incident to and following their transmission.

90. Wireless phone providers typically retain certain transactional information about the use of each telephone, voicemail, and text-messaging account on their systems. This information can include log files and messaging logs showing all activity on the account, such as local and long distance telephone connection records, records of session times and durations, lists of all incoming and outgoing telephone numbers or e-mail addresses associated with particular telephone calls, voicemail messages, and text or multimedia messages. Providers may also have information about the dates, times, and methods of connecting associated with every communication in which a particular cellular device was involved.

91. Many wireless providers retain information about the location in which a particular communication was transmitted or received. This information can include data about which "cell towers" (i.e., antenna towers covering specific geographic areas) received a radio signal from the cellular device and thereby transmitted or received the communication in question.

92. Wireless providers may also retain text messaging logs that include specific information about text and multimedia messages sent or received from the account, such as the dates and times of the messages. A provider may also retain information about which cellular handset or device was associated with the account when the messages were sent or received. The provider could have this information because each cellular device has one or more unique identifiers embedded inside it. Depending upon the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an

46

Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Station Equipment Identity ("IMEI"). When a cellular device connects to a cellular antenna or tower, it reveals its embedded unique identifiers to the cellular antenna or tower in order to obtain service, and the cellular antenna or tower records those identifiers as a matter of course.

93.  Wireless providers also maintain business records and subscriber information for particular accounts. This information could include the subscribers' full names and addresses, the address to which any equipment was shipped, the date on which the account was opened, the length of service, the types of service utilized, the ESN or other unique identifier for the cellular device associated with the account, the subscribers' Social Security Numbers and dates of birth, all telephone numbers and other identifiers associated with the account, and a description of the services available to the account subscribers.  In addition, wireless providers typically generate and retain billing records for each account, which may show all billable calls (including outgoing digits dialed). The providers may also have payment information for the account, including the dates and times of payments and the means and source of payment (including any credit card or bank account number).

94.  In some cases, wireless subscribers may communicate directly with a wireless provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Wireless providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

95.  I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(l)(A) & 2703(c)(l)(A), by using the warrant to require IT&E to disclose to the government copies of the records and other information (including the content of texts and communications) described in Attachment A.  Upon receipt of the information described in Attachment A, government-authorized persons will review that information to locate the items described in Attachment B.

## CONCLUSION

96.  Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that on the computer systems in the control of IT&E there exists evidence of a crime.  Accordingly, a search warrant is respectfully requested. This Court has jurisdiction to issue the requested warrant because it is "a court with jurisdiction over the offense under investigation" as defined by 18 U.S.C. § 2711, 18 U.S.C. § 2703(a), (b)(1)(A) & (c)(l )(A).  Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## REQUEST FOR AN ORDER TO DELAY NOTIFICATION

97.  It is respectfully requested that this Court, pursuant to 18 U.S.C.  §2705, issue an order delaying the notification required under 18 U.S.C. §2703(b) for a period of ninety (90) days, because there is reason to believe that notification of the existence of the order concerning this search warrant would seriously jeopardize the investigation now in progress.

## REQUEST FOR A NONDISCLOSURE ORDER

98.  It is respectfully requested that this Court, pursuant to 18 U.S.C. § 2705(a)(A), issue

48

a nondisclosure order to IT&E for a period of ninety (90) days, because disclosure to any individual or entity in any matter related to this search warrant would seriously jeopardize the investigation now in progress.

FURTHER AFFIANT SAYETH NAUGHT.


Patrick J. Ernst
Special Agent
Federal Bureau of Investigation

49

**ATTACHMENT A**

This warrant applies to all information associated with cellular phone number (671) 727-8558 that is stored at premises owned, maintained, controlled, or operated by PTI Pacifica, Inc., dba IT&E, a wireless provider located at 122 West Harmon Industrial Park Road, Suite 103, Tamuning, Guam.

## ATTACHMENT B

### INFORMATION TO BE DISCLOSED BY IT&E

PTI Pacifica, Inc., dba IT&E is to provide the information requested below from January 9, 2018, to the present date:

1.      Text messages, call logs, voice mails, records, receipts, and notes.

2.      Photographs and videos.

3.      Lists of contacts and related identifying information.

4.      Evidence of user attribution showing who used or owned the telephone number that is the subject of this warrant from January 9, 2018, to the present date.